ADOLPH ROTHMILLER, Respondent, *v.* THEODORE G. STEIN, Appellant.

Plaintiff's complaint alleged in substance that he owned stock of a cor-
poration; that another stockholder offered to purchase his stock, making
two offers, one $80 per share, the other $50 cash per share, with the
right to another $50 in January, 1894, in case the company should in
the meanwhile have paid dividends of ten per cent for 1893. Plaintiff
advised defendants, who were directors of the corporation, of these
offers, and asked them as to the condition of the company that he
might determine which one to accept; that they, knowing the facts,
for the purpose of deceiving plaintiff and making him believe that the
business of the company was flourishing, made statements set forth in
regard to its condition, the amount of stock paid in, etc., which they knew
to be false, and advised him not to sell his stock at less than par; that
relying on these statements he accepted the offer last mentioned; that
the company was at the time insolvent and declared no dividends for
1893, and so plaintiff received but the $50. Upon demurrer to the com-
plaint, *held*, that it set forth facts sufficient to establish a legal fraud and
damages resulting therefrom, to recover which an action was maintainable.
Defendants claimed that as the complaint alleged the company was insol-
vent at the time of the sale of the stock, if they had told plaintiff the
truth he would himself have been guilty of fraud in making a sale
without communicating this fact to the purchaser, and if he had
disclosed it a sale would not have been made. *Held*, untenable; that if
defendants had informed plaintiff that the company was insolvent he
would have been under no legal obligation to volunteer the information
to another stockholder offering to purchase his stock.
The maxim of *caveat emptor* as a general rule applies to sales of goods,
and unless there is some misrepresentation or artifice to disguise the
thing sold, or some warranty as to its character or quality, the vendee is
bound by the sale, notwithstanding the existence of extrinsic defects,
materially affecting its value, known to the vendor and unknown to the
vendee.

The exception to this general rule stated and the authorities upon the subject collated.

*It seems,* that while the law courts will not permit the recovery of damages against a vendor in a case coming under the general rule, because of mere concealment of a fact, yet, if the vendee refused to complete the contract because of the concealment of a material fact, equity will refuse to compel him to do so, as it only compels specific performance of a contract which is fair and open and in regard to which all material facts known to each have been communicated to the other.

In regard to a business corporation engaged in carrying on its business, the mere fact that it is temporarily insolvent is not of that kind of materiality as excepts a sale of its stock by one who had knowledge of this fact, but did not disclose it to the purchaser, from the general rule of *caveat emptor.*

The complaint alleged that the insolvency of the corporation arose from the fact that defendants had failed to pay in $10,000 of the capital stock subscribed for by them and which they had included in the $20,000 of stock certified by them to have been paid in, coupled with the fact that they had grossly mismanaged the affairs of the company and squandered its money in paying large salaries. It did not appear that defendants were unable to pay, or that if they paid for their stock and managed the business properly, the company would not be enabled to continue its business profitably. *Held,* that it could not be said, as matter of law, that if plaintiff had communicated the facts to the intending purchaser he would not have made the purchase.

(Argued October 8, 1894; decided November 27, 1894.)

APPEAL from judgment of the General Term of the Court of Common Pleas for the city and county of New York, entered upon an order made July 9, 1894, which affirmed an interlocutory judgment in favor of plaintiff entered upon a decision of the court overruling a demurrer to the complaint on trial at Special Term.

This action was brought to recover damages for alleged fraud.

The allegations of the complaint are substantially as follows: In October, 1891, articles of incorporation were executed by the defendants and certain other persons and filed in the proper place, which certified the forming of the Grooved Plaster Slab Manufacturing Company, under the laws of New Jersey, with a capital stock of $150,000, $20,000 of which had been actually paid in in cash; defendants each subscribed

for fifty shares of the stock of said corporation, and each agreed to pay therefor $5,000 in cash. Defendants and John Burke were afterwards elected directors, and they elected the officers of said company, the president being one of said defendants and the secretary and treasurer the other, and they were re-elected the following year and continued to perform the duties of their offices until November, 1893. On or about November 9, 1891, said defendants certified under oath that the full amount subscribed had been paid in in cash, viz., $20,000. Shortly after the formation of the company plaintiff became the owner of 118 shares of the stock; after the formation it was solely and exclusively managed by defendants. On May 31, 1892, they declared and paid a quarterly dividend of two per cent, and then stated to plaintiff that a further dividend would be declared in October, and that the business had become so large it would be a dividend of twenty per cent. Prior to August, 1892, plaintiff received from various persons offers to purchase his stock for $100 cash per share, but refused them on account of the defendant's statements. On May 31, 1892, he asked for a detailed statement of the status of affairs of the company, and defendant Stein, as treasurer, delivered to him a written statement which set forth its plant to be worth $4,000 ; merchandise, outstanding accounts and cash on hand, $41,897.73 ; its liabilities $2,226.15, and that it had received in cash $48,384, and expended $29,268.52, leaving $19,115.73 cash on hand. In August, 1892, plaintiff, being about to leave for Europe, asked for another statement, and defendants informed him that the business had increased materially since May 31, 1892, and the assets were much larger than stated in the statement of that date. Upon arriving in London in August, 1892, plaintiff was offered for his stock eighty dollars per share in cash, or fifty dollars per share in cash and fifty dollars more per share on January 1, 1894, if the annual dividends amounted to ten per cent. Plaintiff, relying on defendants' statements, sold ten shares of his stock on the latter offer. On his return to New York October 8, 1892, he informed defendants of the

offer he had received and they told him that he must not sell for less than par; that the business had increased enormously, the company having on hand a large number of orders and its assets having increased greatly, and that much larger dividends than ten per cent would be declared at the annual meeting. Plaintiff, relying entirely and solely on these representations, refused the offer of eighty dollars per share for his stock, and accepted the other offer and sold 100 shares of his stock on those terms. The complaint further alleged that all the defendants' statements above set forth were false, and known by them to be false when made, and were made with intent to deceive the stockholders; that only $10,000 in cash had been paid in, and defendants had failed to pay the $10,000 subscribed by them, and had made false entries in the books of the company to induce the stockholders to believe they had paid their subscriptions; that at the time of the statement given plaintiff in May, 1892, the assets of the company amounted only to a few thousand dollars and the cash on hand to only a few hundreds; that at the time of the August statement as to the increase in business, the business had, as matter of fact, decreased; the company had very little money on hand, was largely in debt and actually insolvent. That the fact that no dividends were declared after May 31, 1892, was due solely to gross mismanagement by defendants, who squandered its moneys and, contrary to its by-laws, paid themselves large salaries amounting to thousands of dollars. Plaintiff having been induced by defendants' false statements to refuse to sell his 110 shares of stock for eighty dollars per share, but having sold them on terms under which he received only $5,500 in cash and was not entitled to receive any more as no dividends were declared, asked to recover $5,500 as damages by reason of said false statements. Defendants demurred on the ground that the complaint did not set forth a cause of action.

*Louis Marshall* for appellant. The action cannot be treated as brought upon any other theory than for the recovery

of damages on the ground of deceit. (*Brinckerhoff* v. *Bostwick*, 88 N. Y. 56.) The action is not maintainable as an action for deceit. (*Brackett* v. *Griswold*, 112 N. Y. 454; *Duke of Newcastle* v. *Clark*, 8 Taunt. 602; *Chrysler* v. *Canaday*, 90 N. Y. 272; *Lamb* v. *Stone*, 11 Pick. 527; *Bradley* v. *Fuller*, 118 Mass. 239.) This action must fail, since the plaintiff has shown affirmatively that he has sustained no legal damage. (*Beach* v. *Sheldon*, 14 Barb. 66; *Brown* v. *Montgomery*, 20 N. Y. 287; *French* v. *Vining*, 102 Mass. 132; *Bruce* v. *Ruler*, 2 M. & R. 3; *Douglass* v. *McFadden*, 15 Kans. 336; *Paddock* v. *Strobridge*, 29 Vt. 470; *Maynard* v. *Maynard*, 49 id. 297; *Cecil* v. *Spurger*, 33 Mo. 462; *Patterson* v. *Kirkland*, 34 Miss. 423; *Koehler* v. *Sanders*, 122 N. Y. 76; *Deobald* v. *Opperman*, 111 id. 676; *Story* v. *Conger*, 36 id. 676; *Hutchins* v. *Hutchins*, 7 Hill, 104; *Miller* v. *Zeimer*, 111 N. Y. 441; *Dung* v. *Parker*, 52 id. 494.)

*William J. Lippmann* for respondent. All the elements of an action for deceit are set forth in the complaint. (Cooley on Torts, 474, 475; *Detroit* v. *Webber*, 26 Mich. 484; *Long* v. *Marvin*, 15 id. 60.) While it is conceded that a mere promise made in the course of negotiations which is never performed, is not of itself a fraud, or the evidence of a fraud, still a promise is sometimes the very device resorted to for the purpose of accomplishing the deception. (5 Am. & Eng. Ency. of Law, 334; *Morrell* v. *Blackman*, 42 Cow. 324; *Oldham* v. *Bently*, 6 B. Mon. 430; *Rawdon* v. *Blatchford*, 1 Sandf. 344; *Schufeldt* v. *Schnitzler*, 21 Hun, 462; *Johnson* v. *Morrell*, 2 Keyes, 663; *Eaton* v. *Avery*, 83 N. Y. 31; *Burrill* v. *Stevens*, 73 Maine, 395; *Nichols* v. *Pinner*, 18 N. Y. 306; *Buckley* v. *Artcher*, 21 Barb. 585.) The claim that there was no affirmative action on the part of the plaintiff is untenable. (*Hubbell* v. *Meigs*, 50 N. Y. 480.) Fraud and deceit in defendant and damage to plaintiff are sufficient, though no benefit accrue to defendant. The action will lie

wherever there has been an assertion of a falsehood with a fraudulent design as to a fact when a direct and positive injury arises from it. ( *White* v. *Merritt*, 7 N. Y. 352 ; *Williams* v. *Wood*, 14 Wend. 146 ; *Hubbard* v. *Briggs*, 31 N. Y. 518 ; *Terwilliger* v. *G. W. T. Co.*, 59 Ill. 249 ; *Booth* v. *Wonderly*, 36 N. J. 250 ; *Reese River Co.* v. *Smith*, L. R. [43 E. & I. App.] 64 ; *Peck* v. *Gurney*, L. R. [13 Eq. Cas.] 79 ; *Henderson's Case*, L. R. [5 Eq.] 249 ; *Paddock* v. *Fletcher*, 42 Vt. 389 ; *Hard* v. *Seeley*, 47 Barb. 428 ; *Newton* v. *Porter*, 5 Lans. 416 ; *Beach* v. *Sheldon*, 14 Barb. 66 ; Story's Eq. Juris. 205, 208.)

PECKHAM, J.    The defendants insist that there is no legal fraud alleged in the complaint, and that even if there be such allegation the complaint does not contain any statement showing that legal damage can flow from the fraud.

We think the complaint is good in both particulars.    The first ground upon which the defendants allege the action is not maintainable is founded upon the statement that the plaintiff was not induced to take affirmative action by defendants' false representations, but that he simply remained passive, did nothing, and refrained from selling his stock at a price which would have been more advantageous to him than that at which he in fact sold.

The plaintiff did not remain passive.    He had received two different offers from one who was also a stockholder and who offered to purchase from him his stock.    The one offer was $80 cash per share ; the other was $50 cash, with the right to another $50 per share in Jan., 1894, in case the company should in the meanwhile have paid dividends for 1893 equal to ten per cent.    The plaintiff asked these defendants for facts in relation to the condition of the company upon which he might make up his mind which offer to accept, and they were informed of the character of the two offers and of the reasons for his inquiries.    The defendants being directors and knowing the facts, and for the purpose of deceiving the plaintiff, made statements in regard to the condition of the company

which they knew to be false, and they did it for the purpose of making him believe, for reasons of their own, that the business of the company was flourishing, and they advised him not to sell his stock at less than par. The plaintiff relied upon these false statements of the defendants thus made to him, which they knew were false, and which they made with a fraudulent purpose, and he, because of the false representations, accepted the offer for the purchase of his stock at the above-mentioned $50 cash rate per share with the conditional promise of $50 more, instead of taking the $80 cash. Instead, therefore, of remaining passive the plaintiff took affirmative action, induced thereto by the fraudulent statements of the defendants. We do not, however, mean to imply the correctness of the doctrine advanced by the counsel for the defendants, that if a person simply refrain from acting, induced thereto by the fraud of another, he can in no case recover damages sustained by him on account of such fraud. Such a case is not here now. Here the plaintiff alleges he has sustained damages because the company was in such a condition pecuniarily at the time of his sale of the stock that it would have been better for him in the money result if he had accepted the $80 cash instead of the $50 conditional offer of purchase which was made to him, and that he would have sold at the former price if the defendants had told him the truth. He had two courses open in selling his stock, and the defendants knew it, and he was induced to take the one from which he has suffered loss because of the fraudulent representations of defendants. It is not alone a failure to sell, but there is also an actual sale produced by the fraud of the defendants. The damage arises from the sale at one price, coupled with the fact that plaintiff would have sold at the other price but for the fraudulent representations of the defendants. The fact that their chief purpose was to induce by means of these false representations a belief on the part of the plaintiff that the company was prosperous, and that their representations were not specially and solely made to induce the plaintiff to sell his stock at one figure rather than another,

is, in the light of all the facts, not material. The defendants knew the reason for and the purpose of the plaintiff's inquiries, and they knew that the direct, proximate and natural result of their fraudulent representations would in that particular case be the sale of the plaintiff's stock by him at the conditional sale at par, rather than the absolute cash one. They must, therefore, be held to have intended what was the natural and direct result of their misrepresentations, although such misrepresentations were not specially induced by a design to bring about such sale.

They cannot in such case shelter themselves under the statement that they did not make the representations, *i. e.*, commit the fraud with the motive or for the purpose of inducing the plaintiff to sell his stock. They intended to deceive the plaintiff and they were induced thereto by other causes, yet the natural, proximate and direct result of such deception they knew or had reasonable ground for believing would be this sale, although its accomplishment was not the particular purpose of their fraud. In such case their liability would seem to be plain.

There is nothing in the case of *Brackett* v. *Griswold* (112 N. Y. 454) which runs counter to this doctrine. In that case it was asserted what there can be no doubt about, that to sustain a recovery in an action for fraud and deceit, the fraud and injury must be connected. The one must bear to the other the relation of cause and effect, and it must be seen in an appreciable sense that the damage flows from the fraud as the proximate and not as the remote cause.

The complaint in this case we hold shows such to be the case. From the allegations in the complaint, if properly denied, it might be a question for the jury to decide whether the plaintiff, if the truth had been told him, would or would not have sold his stock at the rate of $80 cash. The demurrer admits that he would. Having two offers for the purchase of his stock, the inference might be drawn from all the facts stated that if the truth had been told by defendants the plaintiff would have sold at the $80 cash price. The inference

arising from all the facts alleged, that he would have done so if the truth had been told, is neither too remote, indefinite or contingent to form part of the basis of a cause of action. The case differs widely in these respects from *Bradley* v. *Fuller* (118 Mass. 239) and cases therein cited. What a person would have done, but did not do because (as he alleges) of the fraud of another, may not always be a matter of such vague conjecture as to render the question incapable of that degree of proof upon which courts of justice may properly act.

Cases may readily suggest themselves where such possible action would be too problematical and vague to base any verdict upon it. Some of the cases cited in the Massachusetts case (*supra*) would seem to be of that nature. In the case under consideration we think the complaint presents facts from which a jury ought to be permitted to decide the issue whether or not, but for the fraud, the plaintiff would have sold at the cash price. We are, therefore, of the opinion that the complaint contains allegations sufficient to show the commission of actionable fraud.

The other ground taken by defendants is based upon the fact that the complaint alleges that the corporation at the time of the sale of the stock by plaintiff was insolvent, and the defendants claim that if they had told the plaintiff the truth he would have known that fact, and would have been himself guilty of fraud if he did not communicate it to the intending purchaser, and if such purchaser were informed of the financial condition of the corporation it must follow as a legal conclusion that he would not have purchased the stock at all or at least at any such price as was actually received by plaintiff, and hence the latter has sustained no damage by the misrepresentations of the defendants.

In the first place, we are scarcely prepared to say as matter of law that no one would purchase stock in what he knew was an insolvent corporation at the price of $80 a share. That might depend upon a great variety of facts, such as the cause and extent of the insolvency and whether, in the opinion of the intending purchaser, the result were remediable or final,

his familiarity with that cause, and his belief in his or his friends' ability to remedy it, his opinion of the value of the stock if the business were properly conducted, his belief in his own or his friends' ability to properly conduct it at remunera- tive and profitable rates and the prospect of obtaining suffi- cient control over the corporate action by the purchase of stock to enable the purchaser to carry out his policy and con- trol the management of the company. Other facts may be easily imagined which would naturally have great weight with an intending purchaser even assuming the temporary insolvency.

The complaint in this case shows that the insolvency arose from the failure of the defendants to pay in the amount of the capital which they certified they had, viz., $5,000 each out of a total of $20,000 alleged to have been paid in, coupled with the fact that the defendants had grossly mismanaged the affairs of the company and had squandered its moneys in the payment of large salaries and had thereby crippled its business. It does not appear that the defendants are unable to respond to a demand that they pay in the amount of capital due from them, nor does it appear that if it were paid and the salaries cut down and the management changed, that the company would not be able to go on and make a profit on its business.

It cannot be said as matter of law that if the plaintiff had communicated to the intending purchaser the facts as to the condition of the company, no such sale as the plaintiff describes would have taken place and the plaintiff, therefore, would not have been damaged. But even if the defendants had informed the plaintiff that the company was insolvent when he made his inquiries of them, was he under a legal obligation to vol- unteer that information to the intending purchaser before the sale was made? We think not. We do not and we cannot in courts of law practically and wisely deal with mere moral obligations, such obligations as only a man of very high honor would feel himself bound by, or such duties as alone grow out of the moral obligation of doing as you would be done by. These are matters for the conscience, and they are duties which

in the extent of their obligation open up the vast domain of ethics, into a discussion of which it is not practically possible for human courts to enter or to pronounce judgment concerning a violation of its doctrines.

There are, of course, occasions upon which it becomes the legal duty of the individual to volunteer information unasked by another, occasions where a failure to state a fact is equivalent to a fraudulent concealment and avoids a contract equally with an affirmative falsehood.

The inquiry, then, is whether, upon any particular occasion, it was the duty of the person to speak on pain of being guilty of a fraud by reason of his silence. Certain rules have been laid down by the courts which differ somewhat in their breadth and scope with the different and varying circumstances under which they are to be applied. The contract of marine or life insurance has been held to require the exhibition of the very highest good faith on the part of the person desiring insurance, and he has been held liable for the concealment of any material fact known by him to exist, although such concealment was not fraudulent. On the other hand, in the case of the contract of guaranty, it has been held that the concealment of a fact, in order to vitiate the contract, must be fraudulent, *i. e.*, concealed with a fraudulent purpose, with the intent to deceive. (*North British Ins. Co.* v. *Lloyd*, 10 Exchequer, 523 ; *Kidney* v. *Stoddard*, 7 Met. 252.) In regard to sales of goods, the common law has adopted a rule which is not so strict as in the above classes of contracts. The great maxim *caveat emptor* is by this law applied in a variety of cases, and unless there be some misrepresentation or artifice to disguise the thing sold, or some warranty as to its character or quality, the vendee is bound by the sale, notwithstanding the existence of intrinsic defects and vices known to the vendor and unknown to the vendee materially affecting its value. (Story Eq. Juris., 10th ed., vol. 1, secs. 212, 212a.) This is the rule in regard to those who deal at arm's length with each other, and between whom there is no condition of special confidence or fiduciary relationship existing. In regard to the necessity

of giving information which has not been asked, the rule differs somewhat at law and in equity, and while the law courts would permit no recovery of damages against a vendor, because of mere concealment of facts under certain circumstances, yet if the vendee refused to complete the contract because of the concealment of a material fact on the part of the other, equity would refuse to compel him so to do, because equity only compels the specific performance of a contract which is fair and open, and in regard to which all material matters known to each have been communicated to the other. (1 Story Eq. Juris. sec. 206.)

And the rule of *caveat emptor*, even in regard to the sale of chattels, is applied with certain restrictions, and is not permitted to obtain in a case where it is plain it was the duty of the vendor to acquaint the vendee with a material fact known to the former and unknown to the latter. It has been held that it is the duty of one who is about to sell a flock of sheep to inform the intending purchaser of the fact, if it be known to the vendor, of the existence of a highly contagious disease among the sheep to be sold, and that it is a fraudulent suppression of a material fact if it be knowingly concealed. So, in regard to the sale of food for animal or human consumption, the law annexes an implied warranty that the food is not in an unwholesome condition and unfit to be eaten. (*Jeffrey* v. *Bigelow*, 13 Wend. 518 ; *Van Bracklin* v. *Fonda*, 12 Johns. 468.) In such cases the rule of *caveat emptor* cannot be applied. Again, it is not applied in its full extent to the case of sales of choses in action such as bonds and promissory notes and other obligations for the payment of money. Thus in *Brown* v. *Montgomery* (20 N. Y. 287) it was held to have been a fraudulent suppression avoiding the sale of a promissory note, where the vendor did not inform the vendee that the check of the maker of the note had been protested, though the informant of the vendor stated at the time his opinion that the maker of the note was solvent. And this decision rests upon the principle that one who sells commercial paper payable to bearer, and which he does not indorse, while not liable

on the paper as a party, nevertheless warrants that he has no·
knowledge of any facts which prove the paper to be worthless
on account of the insolvency of the makers, or because it has
been already paid.  A promissory note or the ordinary bond
is given for one purpose only, payment at its maturity, and it·
is plain that in ordinary circumstances one would not take a·
note or bond if in possession of the fact of the insolvency of·
its maker.  It would appear that the one purpose for which·
such instruments are issued would fail of accomplishment
because of the inability of the maker to pay.  The mere fact
that the vendor offers to sell the written obligation of another
to pay money is evidence enough of a warranty such as is
above stated, because the vendor knows that if the maker
were known to be insolvent his written obligation to pay
money would not be taken.

Of the same nature is the decision in the case of *Bruce* v.
*Ruler* (2 Man. & Ry. 3; *S. C.*, 17 Eng. Com. Law, 290),
where it was held that it was the duty of the tenant who pro-
posed to his landlord a surrender of his lease to another to be·
taken in his stead, to inform the landlord of the fact which·
the tenant knew, that the proposed tenant (who proved to be·
insolvent) had compounded with his creditors, and that the·
failure of the tenant to state such fact was a fraud which ren-
dered him still liable for the rent.  One of the most material·
and important facts relating to a tenant is that he shall be of
sufficient ability to pay rent, or, in other words, shall not be
insolvent, and Mr. Justice BAYLEY on the trial said it was to
be presumed that if the landlord had known the fact he would
not have accepted the man as tenant, and the suppression of
the fact by the existing tenant was, legally speaking, a fraud ;·
that it was very desirable, if possible, to *make* people honest.
The same reason exists as in the above case of the sale of a
written obligation to pay money, where the vendor does not
indorse or become a party to the obligation, and the fact of
insolvency is of such paramount importance that a presump-
tion exists that the proposed tenant would not have been taken

if the fact were known. Solvency is among the almost absolutely necessary conditions.

Insolvency, however, is not always regarded as of so fundamental a character that its mere concealment in any transaction is in and of itself a fraud. Thus, in *Nichols* v. *Pinner* (18 N. Y. 295) it was held that a merchant who knew that he was insolvent and nevertheless purchased goods without disclosing that fact, there being no inquiry by the vendor, was not necessarily guilty of fraud on account of such concealment, because he might have been honestly of the opinion that he could yet go on and retrieve his affairs. That case was again before this court under the name of *Nichols* v. *Michael* (23 N. Y. 264), but the above doctrine was not altered or shaken. This court, therefore, recognizes that there is a great difference between the insolvency of one who is about to purchase goods and that of the maker of an obligation to pay money, which a third party desires and offers to sell, and it is seen that in the one case the failure to inform the other of the fact of such insolvency is not necessarily a fraud, and in the other its willful suppression is.

We think the present case comes more within the principle of the merchant buying goods than of the seller of commercial paper, the maker of which he knows or has good reason to believe to be insolvent. In the case as made by this complaint the vendee of the stock was already the owner of some of the stock in the same company, and plaintiff was neither a director or other officer of the company, and had no special means of acquiring information superior in the least degree to those of the vendee ; the parties occupied no position of trust or confidence towards each other, and there was nothing in their relations each to the other that had in them the least element of a fiduciary nature. Each was in fact dealing, as it is called, at arm's length with the other, and we cannot say in such case that it would have been the legal duty of the vendor to volunteer the information that the company was insolvent.

The defendant was held liable in *Lefever* v. *Lefever* (30 N. Y. 27) because he had been guilty of false representations, and

1894.]  Rothmiller *v.* Stein.  595

N. Y. Rep.]  Opinion of the Court, per Peckham, J.

his position as cashier put him in full knowledge of the condition of the bank, which the other did not in fact know.

In regard to a business corporation which is engaged in the transaction of business as a going concern, the mere fact that it is at the moment insolvent is not of that kind of materiality which breaks in upon and avoids the general rule in this state of *caveat emptor.*

The purchase of stock in such a corporation is made under so many different circumstances and urged by so many different motives, wholly apart from the present alleged or assumed insolvency of the corporation, that we cannot, and, as we think, ought not, to place the sale of such stock in the same class and subject to the same rules as the sale of commercial paper under the facts as stated in the *Brown* case (*supra*).

I have already alluded to some of the circumstances which might naturally induce the purchase of stock in a corporation temporarily insolvent, and it is not necessary to repeat them here. Under the rule in this state the fact suppressed may in many cases be material, and yet its suppression may not be fraudulent. If there be a legal obligation to speak, such as in a case of trust, or confidence, or superior knowledge, or means of knowledge, the case is altogether different. There is in this case the further fact that the vendee of this stock was the one who proposed the bargain and made the offer ; that he was a stockholder, and presumably before he made the offer had satisfied himself, so far as he desired, as to the condition of the company, and had decided what he could, for his own purposes, properly pay for the stock. It thus appears that the plaintiff was not searching for a purchaser and making offers to sell, but that the purchaser was seeking him, and initiating the transaction by an offer to purchase. The vendor might, under such circumstances at all events, conclude that the proposed purchaser had all the knowledge he desired in order to enable him to make his offer, and the vendor might decide to accept one of the two offers proposed to him without making any statement as to the company not called for by the purchaser.

We cannot say that in the case under consideration there was a legal obligation to speak. But at the same time the least degree of misrepresentation would be very potent evidence of fraud.

We think the demurrer of the defendants is not good, and the judgment overruling it must be affirmed, with costs, with leave to defendants to plead over on payment of costs.

All concur.

Judgment accordingly.